# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| HASKELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:00-CV-1873-VEH |
| | ) | |
| v. | ) | |
| | ) | |
| KOHLBERG, KRAVIS, | ) | |
| ROBERTS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Defendants' Motion to Dismiss the

Plaintiffs' Fourth Amended Complaint (doc. 76).  This matter was the subject of a

hearing before the undersigned, has been fully briefed, and is ripe for review.   For

the reasons stated herein, Defendants' Motion to Dismiss is due to be **GRANTED**.

## Rule 12(b)(6) Standard of Review[1]

---

[1] The Court's decision on the instant motion is based solely upon the parties' pleadings.
The Defendants have submitted evidence along with their Motion to Dismiss; however, the Court
excludes and has not considered Defendants' evidence in reaching a decision on this motion. *See*
Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure
of the pleading to state a claim upon which relief can be granted, matters outside the pleading are
presented to and not excluded by the court, the motion shall be treated as one for summary
judgment and disposed of as provided in Rule 56 ...."). A court may, however, consider
documents to which a plaintiff refers in the complaint which are central to the plaintiff's claim
and which a defendant attaches to the motion to dismiss, without converting the motion to a
motion for summary judgment. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d
1364, 1369 (11th Cir.1997) ("[W]here the plaintiff refers to certain documents in the complaint

A court may dismiss a complaint under Rule 12(b)(6) only if it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002)(citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)).

"[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003)(quoting *Marsh v. Butler County*, 268 F.3d 1014, 1036 n. 16 (11th Cir. 2001)). Furthermore, "[a] complaint may not be dismissed because the Plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* possible theory." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)(emphasis in original)(citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)). "The threshold of sufficiency that a complaint must meet to survive a Motion to Dismiss

---

and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.") (citations omitted). Accordingly, the Motion to Dismiss at bar is not converted to a Fed. R. Civ. P. 56 Motion for Summary Judgment.

for failure to state a claim is . . . 'exceedingly low.'" *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)(quoting *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev.*, 711 F.2d 989, 995 (11th Cir. 1983)).

### **Facts**[2]

In 1995, Bruno's owned a chain of supermarkets.  In August 1995, Defendant KKR acquired Bruno's and, in connection with that acquisition, Bruno's changed its capital structure.   Bruno's issued $400 million in Senior Subordinated Notes (hereinafter "Notes").  This $400 million, together with nearly $500 million in bank loans and $250 million invested by KKR, funded a recapitalization in which most of Bruno's shareholders cashed out their stock. After the recapitalization, Crimson Associates, an affiliate of KKR, owned approximately 83% of Bruno's common stock.  The other shares remained publicly held.

Bruno's common stock was traded on the NASDAQ until August 21, 1995, when Bruno's voluntarily delisted its stock from the NASDAQ.  During the next two years, Bruno's faced increasing competition from companies such as Publix and Wal-Mart.

On February 2, 1998, Bruno's and its subsidiaries filed for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for Delaware.  On

---

[2]As it must, the Court has considered all facts in a light most favorable to the plaintiffs.

December 30, 1999, the Delaware District Court, acting as a bankruptcy court, issued an order confirming Bruno's plan of reorganization.  The instant action was originally filed in state court in August 1999.

Plaintiffs Wyatt R. Haskell (hereinafter "Haskell") and James S. Snow (hereinafter "Snow"), suing on behalf of themselves individually and on behalf of a class of all natural persons or entities similarly situated to Haskell and Snow, are resident citizens of Jefferson County, Alabama, in the Northern District of Alabama. Haskell, Snow, and all members of the potential class allege that they have suffered financial losses due to their purchases on or after June 11, 1996, of Bruno's 10-1/2% Senior Subordinated notes due August 1, 2005 (hereinafter "Notes"), and Plaintiffs attribute their losses to Defendants' misleading statements, "wrongful acts and omissions occurring on or after June 11, 1996."  (Pl. Fourth Am. Compl.; ¶ 1). Defendants' wrongful acts and omissions "include participating in making (or causing Bruno's to make) [sic] misleading statements in documents filed with the SEC on or after June 11, 1996, which made such SEC filings materially misleading, or which suppressed, concealed, or omitted to disclose material statements of facts necessary to be disclosed in order to make the statements made therein not misleading."  (Pl. Fourth Am. Compl.; ¶ 1).

There are more than 100 persons or entities who are members of the proposed

4

plaintiff class.  Excluded from the class are: Defendants; present or former affiliates of a Defendant (as an "affiliate" is defined under Section 14 of the Securities Exchange Act of 1934, including SEC rules and regulations issued thereunder); any transferee of an excluded person or entity who was not a bona fide purchaser for fair value; any officer, director or controlling person of any Defendant; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person.  Haskell and Snow contend that the proposed class of plaintiffs is so numerous and geographically widespread that joinder of all members is impractical.

In August 1995, Bruno's provided investors with a Prospectus in connection with the issuance of the Subordinated Notes.  Haskell did not purchase any Subordinated Notes in 1995, but in late November and early December 1997, he paid $177,268 for $350,000 of the Subordinated Notes.  Haskell continued buying the Subordinated Notes after Bruno's filed for bankruptcy in 1998. On February 18, 1998, he paid $37,125 for $150,000 of the Subordinated Notes.  He made sixteen other purchases during the two years that Bruno's was in bankruptcy, paying a total of $519,000 for $2,764,000 of the Subordinated Notes.  Snow began purchasing Notes on December 18, 1998, and purchased a total face value of $200,000 in Notes for $18,495.

In reliance on the public SEC filings made by Bruno's, Haskell purchased the

following Notes on the following respective dates and still holds the same:

| Date of Purchase | Principal Amount | Purchase Price Paid |
|---|---|---|
| 11/25/1997 | $250,000.00 | $130,000.00 |
| 12/10/1997 | $100,000.00 | $47.267.50 |
| 02/18/1998 | $150,000.00 | $37,125.00 |
| 03/17/1998 | $10,000.00 | $1,905.00 |
| 03/19/1998 | $90,000.00 | $17,780.00 |
| 07/09/1998 | $100,000.00 | $17,500.00 |
| 07/10/1998 | $50,000.00 | $8,629.00 |
| 10/27/1998 | $750,000.00 | $91,875.00 |
| 11/19/1998 | $100,000.00 | $12,300.00 |
| 12/11/1998 | $100,000.00 | $17,500.00 |
| 12/11/1998 | $100,000.00 | $17,500.00 |
| 12/11/1998 | $100,000.00 | $17,500.00 |
| 12/15/1998 | $100,000.00 | $19,000.00 |
| 12/16/1998 | $70,000.00 | $13,300.00 |
| 12/17/1998 | $20,000.00 | $3,600.00 |
| 12/17/1998 | $50,000.00 | $9,000.00 |
| 12/18/1998 | $60,000.00 | $11,400.00 |
| 02/04/1999 | $250,000.00 | $42,500.00 |
| 12/18/2000 | $314,000.00 | $3,177.00 |
| Total: | $2,764,000.00 | $518,858.50[3] |

In reliance on the public SEC filings made by Bruno's, Snow purchased the

following Notes on the following respective dates and still holds the same:

| Date of Purchase | Principal Amount | Purchase Price Paid |
|---|---|---|

---

[3]Haskell continued buying Notes after Bruno's filed for bankruptcy in 1998.  Haskell's purchase of Notes made on December 18, 2000, was made over a year after commencement of the instant action.

6

| | | |
|---|---|---|
| 12/18/1998 | $50,000.00 | $9,500.00 |
| 12/28/1998 | $50,000.00 | $8,495.00 |
| 12/13/1999 | $100,000.00 | $500.00 |
| Total: | $200,000.00 | $18,495.00[4] |

Defendant Kohlberg, Kravis, Roberts & Co., L.P. (hereinafter "KKR") is an investment banking firm which is organized as a Delaware limited partnership with its principal place of business in New York.

Defendant KKR Associates, L.P. is a New York limited partnership with its principal place of business in New York. KKR Associates, L.P. is an affiliate of KKR and at all times relevant was the general partner of Defendant Crimson Associates, L.P. Defendant KKR Partners II, L.P. is a limited partnership organized by KKR and has its principal place of business in New York. Defendant Crimson Associates, L.P. is a limited partnership organized by KKR and has its principal place of business in New York. At all times relevant, KKR owned and controlled KKR Associates, KKR Partners II, and Crimson Associates. From June 11, 1996 to December 31, 1999 the KKR Defendants managed and controlled Bruno's by virtue of owning a controlling interest (approximately 83%) of Bruno's outstanding common stock.

---

[4]Snow purchased Notes only after Bruno's was in bankruptcy. In addition, Snow's purchase of Notes made on December 13, 1999, was made after the commencement of the instant litigation.

Defendants, Henry R. Kravis, George R. Roberts, James H. Greene, Jr., and Paul R. Raether, were at all times relevant general partners of KKR and directors of Bruno's (each having joined its Board prior to June 11, 1996).  Kravis and Roberts each signed Bruno's Annual Reports filed with the SEC for the fiscal years ended February 1, 1997, and January 31, 1998, respectively.  Greene and Raether signed Bruno's Annual Reports filed with the SEC for the fiscal years ended February 1, 1997, January 31, 1998, and January 30, 1999, respectively.

Defendants, Edward A. Gilhuly, Perry Golkin, Robert I. MacDonnell, Michael W. Michelson, Clifton S. Robbins, Scott M. Stuart, and Michael T. Tokarz, were at all times relevant general partners of KKR.

Defendant Ronald G. Bruno was a director of Bruno's at all times relevant after June 11, 1996, and signed Bruno's Annual Reports filed with the SEC for the fiscal years ended February 1, 1997, January 31, 1998, and January 30, 1999, respectively. Defendant William J. Bolton was the Chairman of Bruno's Board of Directors and President of Bruno's at all times relevant after June 11, 1996.  Bolton signed Bruno's Annual Reports filed with the SEC for the fiscal year ended February 1, 1997.

Defendant Robert G. Tobin was at all times relevant after June 11, 1996, a director of Bruno's.  Tobin joined Bruno's Board of Directors in September 1995.

Defendant Nils P. Brous was at all times relevant after June 11, 1996, a director

of Bruno's.  Brous also served as an executive of KKR beginning in 1992.  Brous joined the Bruno's Board of Directors in August 1995, and he signed Bruno's Annual Reports filed with the SEC for the fiscal years ended February 1, 1997, January 31, 1998, and January 30, 1999, respectively.

Bruno's, which had its principal place of business in Alabama, was at all times relevant hereto engaged in the retail grocery and supermarket business. On August 18, 1995, defendants Crimson Associates L.P. and KKR Partners II, L.P. acquired control of Bruno's through a merger transaction and thereafter owned more than 83% of the outstanding shares of Bruno's voting common stock.  The KKR defendants used a "leveraged buyout" technique, by which they only put up a relatively small proportion of the overall funds needed, from their own money, for the $880 million it would take to acquire 83% of Bruno's, and used $630 million of Bruno's money, which (along with other amounts) the Defendants caused it to borrow, pushing Bruno's toward insolvency and the bankruptcy filing described below.  Immediately following such leveraged buyout merger, in August 1995 the Bruno's common stock was de-listed from the NASDAQ National Market System.  On or about February 2, 1998, Bruno's and its subsidiaries filed petitions in bankruptcy under Chapter 11. On or about December 30, 1999, the United States Bankruptcy Court for the District of Delaware, by its order of that date that was entered on its docket on January 4, 2000

(reference to which is hereby made) confirmed the Second Amended Joint Plan of Reorganization of Bruno's and its subsidiaries; a copy of said Reorganization Plan was shortly thereafter filed of public record as part of an SEC Form 8-K Report. Said court order confirming the Reorganization Plan preserved the Plaintiffs' rights to bring actions and claims for recovery of the losses sued upon herein.

Plaintiffs contend that the substance and result of the foregoing events was that the KKR defendants, who by this time possessed significant experience and background in financing and operations of chains of food and retail stores (through their prior experiences with Safeway, Inc. and Stop & Shop Companies, among others), purchased an Alabama company having unused borrowing capacity, used "bootstrap" and leveraged buyout techniques, loaded up the company with a massive debt burden, and then siphoned off Bruno's and subsidiaries' money thereby causing Bruno's services to deteriorate, its product offerings to wither, its stores to become shabby and worn, its customer base to run off, and otherwise ran the company and its business into the ground, in a little over two years, forcing the bankruptcy filing, while throughout such period of machinations (from and after August 1995 through completion of bankruptcy at the end of 1999) concealing the Defendants' plans and various behind the scenes maneuvers from the Plaintiffs and members of the Class, and from Bruno's SEC filings as more particularly described hereafter. Because of

SEC regulations, Bruno's, under the control of the Defendants, had to continue filing SEC 10K annual reports, 10Q quarterly reports, and 8K current reports, even during the bankruptcy period, until the bankruptcy was terminated in early 2000, whereupon Bruno's then was relieved of its obligation to file any further SEC reports.

Plaintiffs contend that, at all times relevant on and after June 11, 1996, Defendants were aware that the values at which Bruno's assets were then being carried on Bruno's books were materially overstated and should be reduced or written down to realizable market values, but failed to do so. The company's asset base, especially in the event of a possible liquidation, is a crucial, very material fact for investors in subordinated debt obligations such as the Bruno's Notes purchased by Plaintiffs and members of the Class.

Plaintiffs argue that, on or about June 11, 1996, Defendants, acting knowingly and intentionally or with deliberate and severe recklessness, and through their control of Bruno's, caused Bruno's to issue financial statements which overstated the value of Bruno's assets (and thereby also overstated net worth), and were materially misleading, and were unduly optimistic without a reasonable basis in fact, and which included materially misleading statements, and/or omitted to disclose material facts necessary to make the statements made not misleading.

The overt acts which Defendants performed or authorized or caused Bruno's

and others to perform included the issuance, filing with the SEC, mailing, publication and dissemination of materially misleading reports, SEC Form 10-K's, SEC Form 8-K's and Form SEC 10-Q's, each of which affected the price paid for Bruno's Notes by plaintiffs and those Bruno's Notes purchased by plaintiffs Haskell and Snow and members of plaintiff class during the period commencing on or about June 11, 1996, including (but not limited to) the following.

    (a)   **Bruno's Form 10-Q issued and filed with the SEC on or about June 11, 1996 for the first quarter ending April 27, 1996.**

The statement in this Form 10-Q that the total book value of Bruno's assets as of April 27, 1996 was $877,192,000 was materially overstated and misleading. As of the date of the filing of this Form 10-Q, Defendants failed to disclose in the Form 10-Q that the reported total book value of Bruno's assets was substantially overstated and, further, that the reported net worth of Bruno's was materially overstated. In addition, under the heading "liquidity and capital resources," this Form 10-Q included the following materially misleading statement:

> Historically, the Company has funded working capital requirements, capital expenditures and other cash requirements primarily through cash flow from operations. The Company believes that operating cash flows will be sufficient to fund store expansion and working capital needs ....

Plaintiffs assert that this statement was materially misleading and also contained a financial forecast which had no reasonable basis in fact because it referred to

"historical" results of Bruno's operations during periods which were not comparable to or indicative of the results of Bruno's operations during the quarter covered by this Form 10-Q, and because this Form 10-Q failed to meaningfully disclose or discuss the significance of Bruno's long-term debt and its interest obligations (more than $80 million per year) on Bruno's operations during the current quarter and the foreseeable future.  Plaintiffs assert that Bruno's "historical" ability to fund its acquisition of new stores, its renovation of existing stores, and its working capital needs out of cash generated from its profitable operations in the past was in no way comparable to the ability of the now heavily-indebted Bruno's to do so in the quarter ending April 27, 1996 or in the foreseeable future (during which Bruno's was obligated to pay more than $80 million of interest each year –  an increase of more than $60 million per year over "historical" interest obligations in prior years). Moreover, Plaintiffs assert that this statement was misleading because it would be understood by a reasonable person to indicate that the results of Bruno's operations had "historically" been profitable, but it failed to disclose that the company had sustained losses of approximately $81 million during the six month period preceding the quarter covered by this Form 10-Q. Plaintiffs assert that Bruno's "historical" ability to fund its cash needs for expansion, store renovation, and working capital needs from its "historical" results of operations was not indicative of Bruno's current results of operations and provided no reasonable

13

basis for said statement of its foreseeable results of future operations and was not indicative of Bruno's current or anticipated future ability to generate cash flow and cash earnings.

     (b)    **Bruno's Form 10-Q issued and filed with the SEC on or about September 11, 1996 for the second quarter ending July 27, 1996.**

Plaintiffs assert that the statement in this Form 10-Q, that the total book value of Bruno's assets as of July 27, 1996 was $860,735,000, was materially misleading. Plaintiffs assert that, as of September 11, 1996, the date of filing of this Form 10-Q, Defendants knew, but failed to disclose in this Form 10-Q, that the book value of Bruno's assets was materially overstated in this Form 10-Q (and, further, that the reported net worth of Bruno's was materially overstated), and that Bruno's was having significant problems with its Georgia distribution center and with unprofitable stores. Plaintiffs assert that management's discussion and analysis of liquidity and capital resources in this Form 10-Q continued to be misleading and to make financial performance forecasts without reasonable basis in fact, and included the following statement:

> Historically, the Company has funded working capital requirements, capital expenditures and other cash requirements primarily through cash flow from operations.  The Company believes that operating cash flows will be sufficient to fund store expansion and working capital needs ....

Plaintiffs assert that this statement was materially misleading and was made without

reasonable basis in fact because it referred to "historical" results of Bruno's operations during periods which were not comparable to or indicative of Bruno's operations during the quarter covered by this Form 10-Q, and because it failed to meaningfully disclose or discuss the significance of Bruno's long-term debt and its interest obligations (more than $80 million per year) on Bruno's operations during the then current quarter and the foreseeable future. Plaintiffs assert that Bruno's "historical" ability to fund its acquisition of new stores, its renovation of existing stores, and its working capital needs out of cash generated from its profitable operations was in no way comparable to the ability of the now heavily-indebted Bruno's to do so in the second quarter of 1996.  Plaintiffs assert that, during the second quarter period covered by this Form 10-Q, Bruno's continued to obtain cash by reducing inventories and increasing its accounts payable to vendors. Plaintiffs assert that, the reduction in inventory continued to have an adverse impact on Bruno's sales, because Bruno's customers were unable to find the products which they had come to Bruno's to purchase, and had to go elsewhere to obtain what they wanted, and in general Bruno's suffered a decline in quality of stores and resulting adverse impact on goodwill and customer patronage.

    (c)    **Bruno's Form 10-Q issued and filed with the SEC on or about December 10, 1996 for the third quarter ending October 26, 1996.**

Plaintiffs assert that, in this Form 10-Q, Bruno's reported losses totaling $88,588,000 on divestiture, sale or closing of 47 stores and a distribution center in Vidalia, Georgia.  Plaintiffs assert that management knew prior to this reporting period, but had failed to report, that Bruno's was having substantial problems in so many of its stores and a distribution center.  Plaintiffs assert that the Form 10-Q failed to disclose that Bruno's business plan for the time period covered by this Form 10-Q had not projected or taken into account the sale of any stores or distribution centers, and that Bruno's "divestiture program" was a radical departure from Bruno's business plan.  Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's remaining assets as of October 26, 1996, after the divestiture, was $774,006,000.  Plaintiffs assert that Defendants knew at the time of filing of this Form 10-Q, but failed to disclose in this Form 10-Q, that the reported total book value of Bruno's remaining assets was materially overstated and materially misleading.

In addition, Plaintiffs assert that this Form 10-Q stated:

Historically, the Company has funded working capital requirements, capital expenditures and other cash requirements primarily through cash flow from operations. The Company believes that operating cash flows will be sufficient to fund store expansion and working capital needs ....

Plaintiffs assert that this Form 10-Q's reference to the "historical" operations of the

16

Company was materially misleading. Plaintiffs assert that the Company's operations during this quarter and the previous two quarters had not shown increasing cash flow or a cumulative profit, but rather substantial cumulative losses, all requiring cash which was generated through the reduction of inventories, increases in accounts payable, and increasing of bank debt, all adversely affecting Bruno's operations and Bruno's ability to service its debt and meet its principal and interest obligations.

(d)   **Bruno's Form 10-K issued and filed with the SEC on or about April 28, 1997 for the fiscal year ending February 1, 1997.**

Plaintiffs assert that the statement in this Form 10-K that the total book value of Bruno's assets as of February 1, 1997 was $791,431,000 was materially overstated and misleading. Plaintiffs assert that, as of the date of the filing of this Form 10-K, Defendants were aware, but failed to disclose in this Form 10-K, that the reported total book value of Bruno's assets was materially over-stated and that the reported net worth of Bruno's was materially overstated. Plaintiffs assert that this Form 10-K also included a materially misleading discussion of Bruno's "divestiture program," under which Bruno's had, during fiscal year, closed one distribution center (in Vidalia, Georgia) and had sold or closed 47 stores, resulting in reported losses on divestiture totaling $88,588,000. Plaintiffs assert that the discussion of the "divestiture program" was materially misleading because this Form 10-K failed to disclose that Bruno's

business plan for that fiscal year had not projected the sale of any stores or any distribution center, and failed to disclose that the "divestitures" and store closings which had occurred during fiscal year 1996 represented a radical departure from Bruno's business plan. Plaintiffs assert that there was no disclosure in this Form 10-K of the effect of Bruno's shrinking business on the ability of Bruno's to meet its current and future interest payments due on its current and future debt obligations.

Plaintiffs assert that this Form 10-K also included the following misleading and omissive statements that lacked a reasonable basis in fact:

> Historically, the Company has funded working capital requirements, capital expenditures and other cash requirements primarily through cash flows from operating activity .... The Company believes that operating cash flows will be sufficient to fund store expansion and working capital needs. If the Company needs additional operating cash, however, it has $78.8 million of a $125.0 million revolving credit facility available.

Plaintiffs assert that the reference to "historical" operations is also misleading because, during each of the previous three quarters, Bruno's had not reported a cumulative profit but had reported significant losses. Plaintiffs also assert that, by this point, Bruno's cash had been depleted to only $4,908,000, and its abilities to raise other working capital had been damaged by Defendants' concealed plans and conduct, so that Defendants knew Bruno's resources would be inadequate for the continued operation of the Company's business (as distinct from liquidation).

Plaintiffs assert that the Form 10-K fails to adequately discuss or disclose the significance of Bruno's heavy debt load and the depletion of Bruno's cash position. Plaintiffs further assert that this Form 10-K fails to disclose that on January 29, 1997, Defendants had significantly revised their projections for Bruno's in light of Bruno's performance and its inability to meet Defendants' previous projections, and fails to meaningfully discuss or disclose the significance of the shrinking of Bruno's business, the divestiture of 47 stores and the Georgia distribution center, and revisions in Defendants' projections for Bruno's on Bruno's ability to honor its obligations to Bruno's noteholders and other creditors.

      (e)      **Bruno's Form 10-Q issued and filed with the SEC on or about June 13, 1997 for the first quarter ending May 3, 1997.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's assets as of May 3, 1997 was $787,765,000.  Plaintiffs assert that the reported book value of Bruno's assets and its net worth were each materially misleading.  Plaintiffs assert that this Form 10-Q includes the statement that Bruno's EBITDA had decreased by $14.5 million in the quarter ended May 3, 1997.  Plaintiffs assert that the Form 10-Q omitted to disclose that Defendants' EBITDA projections had not been met, and that Bruno's EBITDA had to increase substantially each year in order for Bruno's to meet its debt obligations.

Plaintiffs assert that the failure to disclose that Bruno's EBITDA was substantially less than Defendants had projected contributed to rendering this Form 10-Q materially misleading, along with the other omissions and misrepresentations. Plaintiffs further assert that this Form 10-Q's discussion of liquidity and capital resources continued to be materially misleading, stating:

> Historically, the Company has funded working capital requirements, capital expenditures, and other cash requirements primarily through cash flow from operations and borrowings under its revolving credit facility. The Company believes that operating cash flows combined with borrowings under its credit facility will be sufficient to fund store expansion and working capital needs.

Plaintiffs further assert that, at this point, "historically" would be understood by a reasonable person to refer to and include the results of Bruno's operations during the preceding four quarters, during which Bruno's had sustained substantial losses. Plaintiffs assert that Defendants knew when this Form 10-Q was filed that Bruno's could not possibly continue to carry its heavy debt burdens and pay approximately $88,000,000 of annual interest expense, unless Bruno expanded its sales. Plaintiffs assert that  Defendants failed to disclose and explain the significance of the decrease in Bruno's sales and the effect of Bruno's divestiture and closings of its stores.

(f)     **Bruno's Form 10-Q issued and filed with the SEC on or about September 12, 1997 for the second quarter ending August 2, 1997.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's

20

assets as of August 2, 1997 was $774,260,000.  Plaintiffs assert that this reported book value of Bruno's assets, and of its net worth, among other financial factors, was materially misleading.  Plaintiffs assert that this Form 10-Q's discussion of liquidity and capital resources continued to be materially misleading for the same reasons discussed hereinabove in relation to Bruno's earlier SEC report discussions of such topics.

(g)     **Bruno's Form 10-Q issued and filed with the SEC on or about December 12, 1997 for the third quarter ending November 1, 1997.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's assets as of November 1, 1997 was $780,808,000.  Plaintiffs assert that this reported book value of Bruno's assets, as well as the reported net worth of Bruno's, was materially misleading.  Plaintiffs assert that this Form 10-Q's discussion of liquidity and capital resources continued to be materially misleading for the same reasons discussed hereinabove in relation to Bruno's earlier SEC report discussions of such topics; and the otherwise undisclosed extent of Bruno's financial strains known to Defendants would have been exacerbated in their eyes by Bruno's quarterly loss of $65,973,000.  Plaintiffs assert that there was no disclosure that the Defendants contemplated having Bruno's file for bankruptcy or contemplated sale or liquidation of the enterprise.

(h)  **Bruno's Form 10-K issued and filed with the SEC on or about May 1, 1998 for the fiscal year ending January 31, 1998.**

Plaintiffs assert that this Form 10-K stated that the total book value of Bruno's assets as of January 31, 1998 was $622,965,000.  Plaintiffs assert that this reported book value of Bruno's assets, as well as the statement of its reported net worth, was materially misleading.  Plaintiffs assert that this report disclosed that Bruno's had filed for bankruptcy in February of 1998 but failed to disclose the value of Bruno's which its controlling persons (the Defendants) had determined for themselves, and, among other things, failed to disclose that the KKR defendants intended to propose that holders of Bruno's Notes would receive nothing as a distribution in the bankruptcy proceeding.

(i)  **Bruno's Form 10-Q issued and filed with the SEC on or about July 1, 1998 for the first quarter ending May 2, 1998.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's assets as of May 2, 1998 was $667,999,000.  Plaintiffs assert that this reported book value of Bruno's assets, as well as the statement of its reported net worth, was materially misleading.  Plaintiffs assert that this report disclosed that Bruno's had filed for bankruptcy in February of 1998 but failed to disclose the value of Bruno's which its controlling persons (the Defendants) had determined for themselves, and, among other things, failed to disclose that the KKR defendants intended to propose

that holders of Bruno's Notes would receive nothing as a distribution in the bankruptcy proceeding.

(j)     **Bruno's Form 10-Q issued and filed with the SEC on or about September 14, 1998 for the second quarter ending August 1, 1998.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's assets as of August 1, 1998 was $639,519,000.  Plaintiffs assert that the reported book value of Bruno's assets, as well as the statement of its reported net worth, was materially misleading.  Plaintiffs assert that this report disclosed that Bruno's had filed for bankruptcy in February of 1998 but failed to disclose the value of Bruno's which its controlling persons (the Defendants) had determined for themselves. Plaintiffs assert that, like the preceding Form 10-Q, this Form 10-Q suggested that payment terms for the Bruno's Notes would be established in the bankruptcy proceedings, but, among other things, failed to disclose that the KKR defendants intended to propose that holders of Bruno's Notes would receive nothing as a distribution in the bankruptcy proceeding.

(k)     **Bruno's Form 10-Q issued and filed with the SEC on or about December 14, 1998 for the third quarter ending October 31, 1998.**

Plaintiffs assert that this Form 10-Q stated that the total book value of Bruno's assets as of October 31, 1998 was $636,878,000.  Plaintiffs assert that the reported book value of Bruno's assets, as well as the statement of its reported net worth, was

materially misleading.  Plaintiffs assert that this report disclosed that Bruno's had filed for bankruptcy in February of 1998 but failed to disclose the value of Bruno's which its controlling persons (the Defendants) had determined for themselves. Plaintiffs assert that, like the preceding Form 10-Q, this Form 10-Q suggested that payment terms for the Bruno's Notes would be established in the bankruptcy proceedings, but, among other things, failed to disclose that the KKR defendants intended to propose that holders of Bruno's Notes would receive nothing as a distribution in the bankruptcy proceeding.

(l)     **Bruno's Form 10-K issued and filed with the SEC on or about April 30, 1999 for the fiscal year ending January 30, 1999.**

Plaintiffs assert that this Form 10-K stated that the total book value of Bruno's assets as of January 30, 1999 was $606,682,000.  Plaintiffs assert that this Annual Statement reported book value of Bruno's assets was materially misleading.  Plaintiffs assert that this report disclosed that Bruno's had filed for bankruptcy but failed to disclose the value of Bruno's and failed to disclose that the KKR defendants intended to propose that holders of Bruno's Notes would receive nothing as a distribution in the bankruptcy proceeding.  Plaintiffs assert that this Form 10-K failed to disclose that the KKR defendants had already engaged Wasserstein & Perella to appraise Bruno's, failed to disclose the fact that Wasserstein & Pirella had, in February 1999,

submitted to the KKR defendants an "appraisal" of Bruno's, and failed to disclose the contents and purpose of the February, 1999 appraisal prepared by Wasserstein & Perella.

     (m)   **Bruno's Form 10-Q issued and filed with the SEC on or about June 10, 1999 for the first quarter ending May 1, 1999.**

Plaintiffs assert that, in this report, Defendants for the first time disclosed in a "subsequent event" footnote that, on May 27, 1999, the Company's Proposed Plan of Reorganization had been filed with the Bankruptcy Court, disclosed that the "reorganization value of the Company" for purposes of the Company's Proposed Plan of Reorganization was $275,000,000, and disclosed that the Plan of Reorganization proposed by Defendants and filed with the Bankruptcy Court provided that "no payments would be made to holders of the Company's Senior Subordinated Notes or to holders of shares of the Company's existing common stock." Plaintiffs assert that this Form 10-Q continued to fail to disclose that the KKR defendants had, in February 1999, obtained an "appraisal" of Bruno's prepared by Wasserstein & Perella.

## Analysis

Plaintiffs assert claims against Defendants, collectively, pursuant to Rule 10b-5 and Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78j(b); § 18(a) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78r(a); § 20(a) of

the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78t(a); § 20(b) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78t(b); and § 20(c) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78t(c). Essentially, Plaintiffs contend that, due to the misleading and fraudulent conduct of Defendants, the Plaintiffs have suffered financial losses as a result of having purchased Notes within the time frame stated in the Fourth Amended Complaint.

Defendants, in the instant Motion to Dismiss, contend that: (1) Plaintiffs' claims are time barred by the applicable statute of limitations; (2) Plaintiffs' claims are barred by the statute of repose; (3) Plaintiffs fail to state a misstatement or omission as is required under Section 10(b) and Rule 10b-5 of the Securities and Exchange Act; (4) Plaintiffs have failed to state a claim under § 18(a) of the Securities and Exchange Act; and (5) Plaintiffs have failed to state a claim under § 20 of the Securities and Exchange Act.

## I.    Plaintiffs' claims are barred by the applicable statute of limitations.[5]

Plaintiffs' proposed class is limited to all natural persons or entities (other than Defendants) who purchased Notes on or after June 11, 1996. Haskell began purchasing Notes in 1997; Snow began purchasing Notes in 1998. Bruno's filed for

---

[5]Neither the statute of limitations nor the statute of repose at issue in this action are subject to equitable tolling. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).

bankruptcy on February 2, 1998, and the instant action was originally filed in August 1999.

It is the Defendants' position that all of Plaintiffs' claims asserted in the Fourth Amended Complaint were barred by the one-year statute of limitations at the time this litigation was initiated in August 1999. Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 imposes a one-year "statute of limitations" as to all of Plaintiffs' claims asserted in this case. That statute of limitations begins to run once a plaintiff is put on actual or inquiry notice of a possible fraud. Plaintiffs assert that the Fourth Amended Complaint is timely: (1) due to the Plaintiffs' being granted leave by this Court to file an amended complaint asserting any claims they may have under federal law; (2) the relevant event putting Plaintiffs on notice of possible fraud was the publication of the Reorganization Plan assigning no assets to the Notes; and (3) that any determination by this Court as to "inquiry notice" is improper on a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

As a threshold matter, no Order of this Court permitted Plaintiffs to file federal law claims which would have been time barred at the onset of this litigation. The Court's February 13, 2006, Order gave Plaintiffs leave to assert any federal claims it *may* have due to SLUSA preemption of their state law claims. Absent a tolling of the statute of limitations, which this Court has not authorized, the Plaintiffs cannot

maintain a claim that is time barred.

Plaintiffs contend that the relevant event to consider as to whether the Plaintiffs were on notice, inquiry or otherwise, of possible fraud at Bruno's is the publication of Bruno's Reorganization Plan in which Bruno's assigned no assets to the outstanding Notes. Defendants argue that the Plaintiffs were on notice of possible fraud prior to the company's filing for bankruptcy protection.

Inquiry notice is tantamount to actual notice because the bar of the statute of limitations does not begin to run until the fraud is discovered. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773 (1991). The Eleventh Circuit Court of Appeals has held that an announcement by a corporation "that it was filing for bankruptcy was an indication that its previous reports of solid financial health were inaccurate" and was sufficient for "inquiry notice of the possibility that [the corporation] had violated Section 10(b) with its prior assurances of financial health." *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir. 2001); *see also Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1289-90 (11th Cir. 2005). Thus, as a matter of law, once a corporation announces that it intends to file for bankruptcy protection, any potential plaintiffs are on inquiry notice of possible fraud, and the one year statute of limitations begins to run as of the date of the corporate announcement.

In the case at bar, Bruno's actually filed for bankruptcy protection on February 2, 1998. Pursuant to *Theoharous*, any potential plaintiffs were put on inquiry notice as of that date, and any claims filed which are subject to the one year statute of limitations of § 10(b) were only timely if filed within one year from February 2, 1998. The instant action was filed in August 1999; accordingly, all of Plaintiffs' claims are barred by the statute of limitations as Plaintiffs were on inquiry notice of possible fraud at Bruno's as of the date Bruno's filed for bankruptcy protection. As such, all of Plaintiffs' claims asserted in the Fourth Amended Complaint are due to be dismissed.

Plaintiffs argue that the Court would be in error should it determine, on a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), that the Plaintiffs were on inquiry notice. The Plaintiffs are correct that, generally, it would be improper for a court to decide the issue of inquiry notice at the motion to dismiss stage of litigation, and that the issue of notice is a question of fact for the jury. *See Tello*, 410 F.3d at 1283-90. However, a court may reach a decision on the issue of inquiry notice raised by a motion to dismiss where it is apparent, on the face of the plaintiff's complaint, that the plaintiff was on inquiry notice of possible fraud. *Id*.

The above-styled action presents just such a case. It is apparent on the face of the Plaintiffs' Fourth Amended Complaint that, in light of *Theoharous*, Plaintiffs'

claims for relief are time barred.  Accordingly, this Court may properly determine that the Plaintiffs were on inquiry notice of possible fraud at Bruno's as of February 2, 1998.  Plaintiffs' complaint was untimely filed more than one year after that date.

As the Court has determined that Plaintiffs' claims are time barred, no discussion is offered on Defendants' additional arguments in favor of dismissal. Because Plaintiffs' claims are barred by the applicable statute of limitations in this case, Plaintiffs' Fourth Amended Complaint is due to be **DISMISSED WITH PREJUDICE**.[6]  As such, Defendants' Motion to Dismiss is due to be **GRANTED**. A separate Final Order will be entered consistent with this Memorandum Opinion.

**DONE** this 7th day of November, 2006.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[6]There are no federal claims that Plaintiffs might assert which would not be time barred. Allowing Plaintiffs to further amend their complaint would, therefore, be a futile act.  In addition, Plaintiffs cannot maintain a cause of action that is time barred against any of the named Defendants in the above-styled case.

30